## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-286-BAH** |
| **GRADY OWENS,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Grady Owens to forty-two months incarceration, three years supervised release, $2,000 restitution, and the mandatory assessment of $100 for the felony conviction, plus $10 for the class B misdemeanor. The Sentencing Guidelines range, as calculated by all parties, is thirty-seven months to forty-six months. A recommendation of forty months' incarcerations is within the midpoint of that guidelines range.

### I.      INTRODUCTION

The defendant, Grady Owens, enthusiastically participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the

1

On that day, Grady Owens, then a twenty-year old student at Full Sail University, and his father, Jason Owens, joined a crowd gathering on the Northwest lawn of the United States Capitol grounds. This area is in front of the West Plaza, Lower West Terrace (LWT) of the Capitol Building, and the Inaugural Stage. These areas became key battle ground points which, once overrun, allowed rioters to access the building. Members of this ever-growing crowd, including Grady Owens, became verbally hostile toward United States Capitol Police (USPC) officers who were there to protect the Capitol Building. As a squad of officers from the Metropolitan Police Department (MPD) attempted to cut through the lawn to assist USPC officers on the Plaza and Lower West Terrace, Grady, Jason, and their fellow rioters refused to move. After the rioters ignored the officers' verbal commands to move, officers began pushing members of the crowd out of their way. Numerous officers had already made it past the Owenses when MPD Officers C.B. and N.D. approached them. Officer C.B. pushed someone out of his way, in response, Grady Owens violently attacked Officer C.B. by raising his skateboard above his head and bringing it down to strike C.B. on the upper right part of his body.

Grady Owens' assault on Officer C.B. caused a ripple effect in which other rioters assaulted other police officers, including his father who assault Officer N.D. After the skirmish settled, Grady Owens yelled at officers and gave them the middle finger.  Grady Owens and his father then made their way to the East Rotunda doors where they were emersed in a mob pushing, grabbing, and swinging at more uniformed officers.

The government recommends that the Court sentence Grady Owens to forty months'

United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

incarceration for his convictions of violating 18 U.S.C. § 111(a) and 40 U.S.C. § 5104(e)(2)(D), which is slightly below the mid-point advisory Guidelines' range of thirty-seven to forty-six months, which the government submits is the correct Guidelines calculation. A forty-month sentence reflects the gravity of Grady Owens' conduct, but also acknowledges his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense filed in this case, ECF 97, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.  Grady Owens' Role in the January 6, 2021, Attack on the Capitol

#### *Approach to the Capitol*

Grady Owens' crimes on January 6 are documented through a series of videos and photographs taken by himself, body worn cameras worn by MPD officers, open-source media, and United States Capitol Police (USCP) surveillance footage from inside the Capitol.

Grady Owens traveled to Washington, D.C. from his family's home in Blanco, Texas, on January 5, 2021, with his father, Jason Owens, and his grandparents. The Owenses attended the "Stop the Steal" rally on January 6, 2021. Grady Owens wore a red jacket and black pants while Jason Owens wore a camo jacket, gray jeans, gray hat, and a gator. Grady Owens carried a skateboard with him that day while Jason Owens was in possession of a scooter.



*Image 1:* *Still from an open source showing Grady (yellow circle) and Jason Owens (green circle) near the rally*[2]

At the rally, Grady and Jason Owens watched former President Trump's speech. Grady

Owens took video of the rally on his mobile telephone. The video showed Trump denying the

---

[2] Available at
https://ia903109.us.archive.org/19/items/6bdmfu2DDuAczZAsC/6bdmfu2DDuAczZAsC.mpeg4
(39-42 seconds).

election results[3] and rioters waiving a flag of Donald Trump depicted as Rambo.



*Image 2: Still from Grady Owens' phone (Exhibit 4[4])*



*Image 3: Photo from G. Owens' phone of a banner depicting a machine gun wielding Trump as Rambo (Exhibit 2)*

After Trump's speech, Grady and Jason Owens went to the Capitol Grounds. The pair

worked their way up the Northwest lawn towards the West Plaza. Grady Owens captured their

arrival on his cell phone. In Exhibit 5, Grady Owens can be heard commenting on an arrest made

---

[3] *See* Exhibit 4.

[4] In advance of the change of plea, the government submitted an exhibit list in support of the statement of offense.  The government has resubmitted that list, with a few additions, in support of this sentencing memorandum.

by USCP officers, stating, "And they're going to keep arresting people unless we all get our asses up there!"



*Image 4: Still from **Exhibit 5** in which, at 00:38 seconds, Grady comments on a fellow rioter's arrest (circled) on the Northwest stairs*

Grady Owens continued to document the ever-growing hostility and sentiments in the crowd.



*Image 5: Grady photographed a sign reading "If the dead can vote just wait and see what the living can do" **(Exhibit 31)***

### *Grady Owens' Comments on Capitol Grounds*

Grady Owens began to taunt USPC officers as they attempted to protect the Capitol building and maintain order. *See* Exhibits 21-24. Grady Owens made many statements, while recording video on the lawn, including, "That ain't gonna do much traitor…Hold these traitors accountable,"[5] "We will not concede,"[6] "They breached it. You can't stop us,"[7] and "Tear gas ain't shit, folks."[8]



**Image 6:** *Still from **Exhibit 23** shows rioters, on the Northwest stairs, raising barricades above their heads as Grady proclaimed, "They breached it. You can't stop us!"*

---

[5] *See* Exhibit 21 at :38 seconds. Owens said that while recording USCP officers deploying pepper spray and firing pepper balls into the riot.
[6] *See* Exhibit 22 at :25 seconds.
[7] *See* Exhibit 23 at :12 seconds.
[8] *See* Exhibit 24 at :02 seconds.

### *Grady Owens' Conduct on Capitol Grounds*

As Grady Owens and his fellow rioters continued to present an active security risk for both USCP officers and the Capitol Building itself, MPD officers, equipped with body worn cameras (BWC), arrived, just before 2:00 p.m., as much needed reinforcements for the USCP officers. Officer C.B. and his fellow MPD officers were wearing full riot gear. They had a quick briefing before falling into a two-by-two formation that marched the length of the Northwest lawn.[9] MPD Officer P.M. yelled "Police department, move aside" numerous times as he led the way. Members of the mob took note of the police presence and began to verbally harass the officers marching behind Officer P.M.

 

*Image 7: Side-by-side stills from **Exhibit 11** showing MPD getting into formation (L) and a USCP officer assisting MPD through Pennsylvania Circle to the West Plaza (R)*

The crowd grew so dense that the officers had to fall back one-by-one, holding onto each other by putting their arms on each other shoulders. *See* Exhibit 18 at 5:30. As lead Officer P.M. met increasing resistance, he began to push rioters out of the way, continuing to announce the

---

[9] The government refers the Court to Exhibits 11 through 19. These BWC video exhibits have been labeled in an order that approximately reflects each officer's position in the line. The government suggests watching these exhibits in numerical order as it paints a complete picture. The exhibit list provides the relevant time stamps for each video exhibit.

MPD officers' presence. Officer P.M. pushed past Grady and Jason Owens and, in response, Grady yelled, "Hey!" as Jason pushed back against the officers. Someone yelled the word, "Traitor!" numerous times. *See* Exhibit 12 at 6:10-6:15.

Grady Owens was filming the crowd at this exact moment. As he turned, he captured on the video the line of officers attempting to get through the crowd. In the screen shot immediately below, Officer C.B. is positioned somewhere in the line of officers behind the man in the gray and black sweatshirt and camo print hat.



*Image 8: Still from Exhibit 6 showing the moment MPD reached the Owenses (see time stamp :23)*

Grady Owens took the time to put his cell phone away before both he and Jason Owens

engaged in physical assaults with the MPD Officers. BWC video shows Grady shouting "fuck

off." *See* Exhibit 15 at 6:08 and Exhibit 16 at 6:10.



*Image 9: Still from **Exhibit 13** captured Grady Owens registering police presence and putting his phone away as Jason Owens shoves with an MPD officer (see time stamp 5:30—5:37)*



*Image 10: Still from **Exhibit 16.** Exhibit 16 is BWC that captured Grady pushing against an MPD officer while saying "fuck off." Officer C.B. was still two or three officers back at this point (see time stamp 6:10-6:14)*

***The Assault of Officer C.B.***

At approximately 2:00 P.M., Officer C.B. had to move people out of his way as he nears Grady Owens.  Grady then raised his skateboard above his head, and brought it down, with full force, onto the right side of Officer C.B. *See* Exhibit 18 at 6:15 through 6:25 and Exhibit 19 at 6:00 through 8:00).



***Image 11:*** *Still from **Exhibit 19** (N.D.'s BWC) showing C.B. (blue circle) nearing Grady (see time stamp 6:15)*



*Image 12:* *Still from **Exhibit 19** at 6:16 showing Grady Owens raising his skateboard above his head as he stares at C.B.*



*Image 13:* *Still from **Exhibit 19** at 6:16 showing Grady Owens striking Officer C.B. on the upper right body near the head and shoulder*

In response, the riot members, including Jason Owens, began shoving officers. Jason Owens stuck Officer N.D. in the chin area. The police squad and rioters at that location continued to skirmish for approximately thirty seconds after Grady Owens struck Officer C.B. Once the crowd calmed down, the Owenses continued to yell at and taunt the officers. For instance, Grady asked the officers, "How can you live with yourselves, huh?" *See* Exhibit 31 at 5:00.



***Image 14:*** *Still from **Exhibit 32** at 5:05*

A short time later, he held up his middle finger in officers' faces. *Id*. at 5:10.



*Image 15: Still from **Exhibit 32** (at 5:10) where Grady says "mother fucker" to officers and holds up his middle finger*

Officer C.B. and fellow MPD officers left the area and continued their response to rioters on the Lower West Terrace. Rather than retreating from the chaos, Grady and Jason Owens remained on the Northwest Lawn for an undetermined amount time, before making their way to the East Rotunda Doors.



*Image 16: Still of Grady and Jason at the West Plaza[10]*

---

[10] Available at https://www.alamy.com/washington-usa-06-january-2021-supporters-of-

***Grady Owens' Continued Conduct on Capitol Grounds Post Assault***

At approximately 3:25 p.m., after traveling from the west to the east side of the Capitol building, Grady and Jason Owens attempted to enter the Capitol building at the East Rotunda doors.



*Image 17: Open-source photograph showing the Owens' nearing a police line holding back rioters at the East Rotunda. Jason Owens appears to be pointing at officers (**Exhibit 25**)[11]*

Grady and Jason Owens were part of a crowd that attempted to push their way into the East Rotunda doors without success. Grady Owens filmed the hectic scene at the East Rotunda as well, commenting on the fact police were "macing" rioters to prevent them from accessing the building.

---

president-donald-j-trump-breach-capitol-hill-during-the-certification-of-the-electoral-colleges-vote-image396742212.html

[11] Available at https://www.gettyimages.com/detail/news-photo/police-intervenes-in-us-president-donald-trumps-supporters-news-photo/1230459039

*See* Exhibit 26 at 00:12 seconds. Grady Owens also appeared to be giving directions to fellow rioters by yelling "Left side out-right side in, come on!" *Id.* at 00:22-:25 seconds. The Owenses made it to the threshold of the Rotunda doors where a group of MPD and USCP officers desperately tried to prevent entry. *See* Exhibit 27 and 28.



*Image 18: Still from Exhibit 27 showing Jason Owens' hand pointing towards the inside of the Capitol building (time stamp 00:21)*



***Image 19:*** *Still from **Exhibit 28** (at 3:28 p.m.) showing the Owenses' at the threshold of the Capitol*

At approximately 3:29 p.m., Jason Owens tried to grab USCP Officer M.B. Jason Owens then blocked the door from being closed. *See* Exhibit 28 at 3:28 p.m. through 3:30 p.m.. Officer M.B. exited the door and moved toward Jason Owens who then grabbed Officer M.B.'s baton. *Id*. The two pushed back and forth for a short period of time before Officer M.B. was able to push Jason Owens away. *Id*. Grady also appears to swing a flag, in a similar downward motion as he did with the skateboard, as if to break up the officer and his father. *Id*.

The Owenses were not successful in getting into the Capitol Building. Eventually they left the Capitol grounds after memorializing their presence with a celebratory portrait photo.



***Image 21:*** *Photograph, from Grady's phone, of the Owenses in front of the "War" statue*[12] *flanking the East Front Entrance to the Capitol building (**Exhibit 1**)*



***Image 22****: Photograph of Grady proudly displaying "The truth is viral" written on his hand while on Capitol Grounds (Exhibit 29)*

---

[12] Information regarding the statute available at https://www.aoc.gov/explore-capitol-campus/art/war-and-peace

*Grady Owens' Statements*

FBI agents executed warrants to search Grady Owens' phone and social media accounts. A review of the recovered material revealed a Signal chat from January 8, 2021. In that chat, Grady Owens likened "damage" at the Capitol to a "knee scrape," when compared to "BLM riots" which were a "severed torso." *See* Exhibit 30.

## III.    THE CHARGES AND PLEA AGREEMENT

On November 17, 2021, a federal grand jury returned a superseding indictment charging Grady Owens with seven counts, including, 18 U.S.C. § 111(a) and 40 U.S.C. § 5104(e)(2)(D). On, November 10, 2022, Grady Owens was convicted of 18 U.S.C. § 111(a) and 40 U.S.C. § 5104(e)(2)(D)based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Grady Owens now faces sentencing on Count Two, 18 U.S.C. § 111(a), and Count Thirteen, 40 U.S.C. § 5104(e)(2)(D). As noted by the plea agreement and the Presentence Report Grady Owens faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for Count Two. He faces a maximum sentence of six months imprisonment, a term of supervised release of not more than five years, a fine up to $5,000 for Count Thirteen.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007).   The guidelines do not apply to Count Thirteen. U.S.S.G. § 1B1.9; 40 U.S.C.
§ 5104(e)(2)(D).

The Guidelines analysis follows:

Count Two: 18 U.S.C. § 111(a)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon used | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **21** |

*See* Plea Agreement at ¶ 4(A).

The U.S. Probation Office calculated Grady Owens's criminal history as Category I, which
the government does not dispute. PSR ¶ 55. Accordingly, based on the government's calculation
of Grady Owens' total adjusted offense level, after acceptance of responsibility, at 21, the
Guidelines advisory imprisonment range is 37 to 46 months' imprisonment. Grady Owens' plea
agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation
contained herein.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance,
the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Grady Owens's violent and felonious
conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the
Certification Vote from being carried out, frustrating the peaceful transition of Presidential power,

and throwing the United States into a Constitutional crisis. Grady Owens partook in a criminal event that is still, to this day, unparalleled in American history.

The nature and circumstances of this defendant's crimes weigh heavily in favor of a significant term of incarceration. Grady Owens filmed himself taunting police. When the opportunity presented itself, he assaulted a uniformed officer who was simply responding to an ongoing emergency, then mocked officers with profane remarks and gestures. After the assault, Grady Owens did not leave the grounds. Instead, he traversed to the East Rotunda doors where he joined a large group of rioters attempting to gain access to the Capitol Building itself. The nature and circumstances of Grady Owen's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 42 months.

### B.  Grady Owens' History and Characteristics

Grady Owens is a former student and Sound Engineering major at Full Sail University. PSR ¶ 96. He has no prior juvenile nor adult convictions. He did admit to recreational use of marijuana.

Though Grady Owens has no prior record, his January 6th assault on Officer C.B. was extremely violent and luckily did not result in serious injury to the victim. Grady Owens displayed an utter lack of respect for law and order on that day. He physically assaulted one officers and verbally taunted others. He did not simply lay hands on uniformed officers but used a blunt and deadly object to strike an officer for merely doing this duty to protect the Capitol and its lawful occupants.  This was all done despite his "amazing" and supportive childhood, where he did not witness verbal or physical violence. *See* PSR ¶¶ 63. Grady Owens' words and assaultive actions from January 6 weigh heavily in favor of a lengthy sentence.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Grady Owens' criminal conduct, raising a skateboard, a deadly weapon, above his head and bringing it down upon a uniformed MPD officer, with full force, was the epitome of disrespect for the law. Especially when the criminal assaultive conduct was accompanied by hostile taunting and continued aggressive conduct towards police at the East Rotunda doors.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[13] The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although Grady Owens has pleaded

---

[13] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

guilty, his actions after assaulting Officer C.B. (behavior at the East Rotunda and statements after January 6) were those of a man girding for battle. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).  Grady Owens' actions that day demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly considering his violent assault and rhetoric that day.  Grady was also quick to down play the seriousness of the day, calling it a "knee scrape."

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

23

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

###    F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[14]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[15]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[14] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[15] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Cody Mattice and James Mault,* 21-cr-657 (BAH), the defendants traveled to Washington, D.C. anticipating violence. They engaged officers on the front lines at the West Plaza and in the Lower West Terrace Tunnel, and assaulted officers with chemical irritants. Before that, Mattice recorded, on a mobile phone video Mault encouraging officers who were guarding the outside of the Capitol building to stand aside and let the rioters gain access to the building. This Court imposed identical custodial sentences of 44 months' incarceration.

In United *States v. Gregory Rubenacker*, 1:21-cr-193 (BAH), the defendant was one of the first rioters to breach the Capitol and was part of a mob that chased Officer Eugene Goodman up a staircase inside the Capitol building as Senators were still fleeing for their lives. He exited the Capitol but entered a second time. When confronted by police in the Rotunda who were trying to force the rioters out of that location, Rubenacker swung a plastic water bottle at one officer and sprayed an unidentified liquid from that bottle on other officers. Later, he posted statements on Snapchat celebrating his conduct on January 6.  This Court imposed a custodial sentence of 41 months.

Finally, in *United States v. Howard Richardson*, 1:21-cr-721 (CKK), the defendant joined the storming of the police line on the West Terrace while carrying a metal flagpole. As he stood at the front of a line of police officers struggling to maintain their position and hold the mob back, Richardson struck an officer three times with the pole. Moments later, he helped a group of rioters force a very large metal billboard into the same line of besieged officers. Judge Kollar-Kotelly

26

sentenced Richardson to 46 months' incarceration.[16] The government's recommended sentence of 42 months incarceration in this case would not create an unwarranted disparity with sentences imposed on similarly situated defendants.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[17] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Grady Owens must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Owens played in the riot on January 6.[18] Plea Agreement

---

[16] Both the government's recommendation and Judge Kollar-Kotelly's sentence considered that Richardson quickly accepted responsibility and entered an early guilty plea.

[17] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[18] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9

at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other agencies as of October 2022. *Id.* Grady Owens' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 125.

The parties have also agreed, as permitted under 18 U.S.C. § 3663(b)(2 or 18 U.S.C. § 3663A(b)(2), that Grady Owens may pay restitution to Officer C.B., as determined by the Court. Plea Agreement at ¶ 13. This Court should order Grady Owens to pay restitution to the MPD, the employer of Officer C.B., to the extent it paid any expenses for his medical treatment. *See* 18 U.S.C. § 3664 (j)(1) ("If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation.") The Government requests the issuance of the restitution order be delayed for 90 says so it can determine how much, if anything, the MPD was out of pocket for any of Officer C.B.'s medical expenses. *See* 18 U.S.C. § 3664(a)(5).

---

(D.D.C. 2012) (citations omitted).

### VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of forty months incarceration, three years of supervised release, and restitution as later determined by the Court.[19]

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Rebekah E. Lederer*
REBEKAH E. LEDERER
Assistant United States Attorney
Bar No. PA 320922
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-7012
Rebekah.Lederer@usdoj.gov

---

[19] The government has identified no information that Grady Owens has raised any funds based on his participation in the January 6 riot. This Court has stated that the raising of such funds is a fact it will consider when deciding whether or not to impose a criminal fine.